## Eric Chittenden, et al. v. Waterbury Center Community Church, Inc., et al.

[726 A.2d 20]

No. 97-235

Present: **Dooley, Morse, Johnson and Skoglund, JJ., and Katz, Supr. J., Specially Assigned**

Opinion Filed December 11, 1998

*Matthew C. Colburn, Law Office of Richard A. Unger*, Montpelier, for Plaintiffs-Appellants.

*Gene Ann Condon* and *Albert G. Besser* (Of Counsel), Stowe, for Defendants-Appellees.

*Thomas E. McCormick* and *Thomas P. Simon* of *McCormick, Fitzpatrick, Kasper & Burchard, P.C.*, Burlington, and *Von G. Keetch* and *Randy Austin* of *Kirton & McConkie*, Salt Lake City, Utah, for Amici Curiae Church of Jesus Christ of Latter-Day Saints, et al.

**Dooley, J.** This case concerns a driveway that separates the Cold Hollow Cider Mill in Waterbury Center, one of the state's busiest tourist attractions, from a neighboring church. Plaintiffs and counterclaim defendants Eric and Francine Chittenden are the owners of the cider mill business and the real property it occupies. They appeal from a judgment entered in the Washington Superior Court concluding that the driveway in question is the property of defendant and counterclaim plaintiff Waterbury Center Community Church, Inc., free of any claim by plaintiffs. The heart of plaintiffs' case is that they are entitled to a prescriptive easement over the driveway. On appeal, plaintiffs contend that (1) 12 V.S.A. § 462, which effectively protects property belonging to religious institutions and certain other entities from claims of adverse possession, violates both the U.S. and Vermont constitutions,[1] (2) notwithstanding § 462, plaintiffs enjoy an easement based on the doctrine of presumed grants, and (3) the church's claim of unencumbered title to the driveway is barred by laches. We affirm.

## I. Background

The case was tried to the court, which issued extensive findings of fact, not challenged here, and conclusions of law. Accordingly, we draw our summary of the relevant facts from the trial court's findings.

Plaintiffs' business, the Cold Hollow Cider Mill, operates on a four-acre parcel of land located on the east side of Route 100 in Waterbury Center. Bordering plaintiffs' property on the south and

---

[1] On this point, defendant is supported by an amici curiae brief filed by the Church of Jesus Christ of Latter-Day Saints; Baptist Joint Committee on Public Affairs; Christian Legal Society; First Church of Christ, Scientist; United Methodist Church; General Assembly of the Presbyterian Church; Reorganized Church of Jesus Christ of Latter Day Saints; Seventh-day Adventists Church; United House of Prayer; and Worldwide Church of God.

also fronting on Route 100 is the real property owned by defendant, Waterbury Center Community Church, Inc., a Methodist congregation. Plaintiffs have run their business at its present location since April 1976, operating out of a series of buildings constructed in the early-to-mid-nineteenth century. The church building was constructed in 1833, and the church traces its title to the land to a "conditional lease" executed in the following year. The 1834 conveyance provides that the "premises shall be used and occupied by [grantees] as a site for [a] Meeting house and necessary appendages thereto, and for no other purpose."

Located between the buildings on plaintiffs' property and the church building is a gravel driveway, referred to in the record as the "north driveway" and leading eastward from Route 100.[2] Branching off from the north driveway to the south is a second, semicircular driveway that provides direct access to the front of the church building. The church uses the north driveway for vehicular access to its semicircular driveway as well as for parking to the north of the church building. Plaintiffs use the north driveway to provide public access to their business.

Since 1834, the church has held weekly religious services, additional services on religious holidays, and occasional weddings and funerals on its premises. Church suppers have taken place there on an occasional basis throughout the twentieth century. During the 1960s and 70s, church attendance fell off, and the condition of the church building deteriorated. As a result, the church did not use the building during the winter months for several years. However, use of the church building increased in the 1980s, and it was restored. Various outside groups such as Alcoholics Anonymous and Weight Watchers use the church occasionally. The church holds three flea markets and three chicken pie suppers each year. Weekly Sunday services generally attract between 40 and 50 worshipers.

Plaintiffs' property was owned by Keith H. Gibbs and/or Colleen R. Gibbs from 1945 to 1973, the last year in which Mrs. Gibbs occupied the property as a widow. During this period, the owners used the property both for residential purposes and to conduct extensive

---

[2]There is also a south driveway on the church's property. At times in the past, it has been used to give access to parts of plaintiffs' property, particularly that lying behind and to the east of defendant's parcel. The parties' respective rights to the south driveway were also an issue in the trial court, which made extensive findings on the subject. Since the south driveway does not directly figure in the issues on appeal, we have omitted the findings relevant to it.

commercial operations, including: a milk-hauling business; a dairy farm; marketing, auctioning and transportation of cattle; and the hauling of sand, gravel and fill. All social and business invitees of the owners used the disputed driveway for parking and access to the rear of the property, as did their tenants and employees. During this period, many large trucks used the driveway on a regular basis.

From 1973 to July 1976, plaintiffs' property was occupied by Richard and Linda Angelino. The Angelinos used the driveway for access for themselves and for tenants residing in an apartment on the premises, and for transporting horses onto and off the property. Farmers used the driveway during this period to access the Angelinos' barn for hay storage. The public was also permitted to use the driveway to gain access to farm pastures located to the east of the parties' property.

Since purchasing the property in 1976, plaintiffs have used it for both residential and business purposes. Their cider mill business has grown steadily during their ownership. By 1994, annual visitors had increased to more than 250,000. Mail-order and wholesale operations now account for more than half of the cider mill's business volume.

A significant aspect of plaintiffs' business involves patrons arriving by bus. From the onset of operations through June 1991, defendant made no objection to buses gaining access to plaintiffs' property via the north driveway. During the first year plaintiffs operated their business, approximately fifty buses visited the facility. By the late 1980s, the volume had increased to approximately 600 buses per year, ninety percent of which make their visits between late August and late October. During this peak period, as many as thirty buses visit daily. The buses unload their passengers on the north driveway and park behind the church on plaintiffs' property. Occasionally, a bus remains next to the church with its engine idling to wait for another vehicle ahead of it to unload.

Over the many years that plaintiffs or their predecessors in title have used the north driveway, they performed nearly all of the maintenance on it. This work included grading, graveling and snow plowing, all of which have gradually widened the driveway approximately 1½ feet onto the lawn of the church. No one associated with the church ever gave the plaintiffs or their predecessors permission to use the driveway and, indeed, no such permission was ever requested.

The church engaged a surveyor in 1973 who determined that the north driveway is located entirely on the church's property. A second

survey commissioned by the church in 1991 also confirmed that the church owned the north driveway.

Church trustees invited plaintiffs to attend their meeting on June 13, 1991. At that meeting, the church trustees disclosed for the first time that they contended that the church owned the north driveway and that plaintiffs had no right to its use. The church demanded deeded rights to parking on plaintiffs' property in exchange for deeded rights to the north driveway. Plaintiffs refused, maintaining they owned the driveway. The church trustees warned the plaintiffs they would close off the north driveway for one complete day at some point before July 13, 1991.

On an unspecified date in July 1991, while the cider mill was open for business, one of defendant's trustees placed a barricade across the north driveway bearing a sign reading "driveway closed today." Plaintiff Eric Chittenden immediately removed the barricade and placed it behind the church. A similar incident occurred on Thanksgiving Day of 1991. Twice in 1992, work parties from the church erected fences across part or all of the north driveway. On the last occasion, plaintiff had to use a forklift to remove the fence. When it became clear that the church would continue to block the driveway, plaintiffs brought this action and sought a preliminary injunction.

The complaint named as defendants the church, the chairman of its trustees and six other individuals whom plaintiffs contended were acting on the church's behalf. Defendants counterclaimed, asserting trespass and seeking a declaratory judgment in their favor on the easement issue. In lieu of the requested preliminary injunctive relief, the parties agreed to preserve the status quo ante — permitting plaintiffs to continue their use of the north driveway pending the ultimate resolution of the dispute. The court bifurcated the case, deferring the issue of damages and conducting a bench trial to resolve the parties' competing ownership claims. Following trial and the extensive findings summarized above, the court concluded that plaintiffs did not acquire an interest in the north driveway via adverse possession, a prescriptive easement or a presumptive grant. On motion of plaintiffs, the court amended its findings and conclusions to determine, in relevant part, that the equitable doctrine of laches has no application to this case. The court entered its judgment on May 12, 1997, and this appeal followed.

## II. Constitutionality of 12 V.S.A. § 462

Plaintiffs' first claim on appeal is that 12 V.S.A. § 462 is unconstitutional. The trial court relied on this statute in determining that

plaintiffs have no claim to the north driveway by adverse possession or prescriptive easement.

Generally, Vermont law applies a fifteen-year limitation period to actions seeking recovery or possession of land. See 12 V.S.A. § 502. Accordingly, one who seeks to maintain a claim of adverse possession or to assert a prescriptive easement must demonstrate that the use or possession in question has outlasted this limitation period. See *Community Feed Store, Inc. v. Northeastern Culvert Corp.*, 151 Vt. 152, 155, 559 A.2d 1068, 1070 (1989) (noting that elements of adverse possession and prescriptive easement claims are "essentially the same"). In this case, however, there is no limitation period because of the effect of 12 V.S.A. § 462. That provision exempts from any limitation period all ownership claims relating to "lands given, granted, sequestered or appropriated to a public, pious or charitable use, or to lands belonging to the state." *Id.*

Plaintiffs contend that § 462 violates the Establishment Clause of the First Amendment to the United States Constitution as well as Chapter I, Article 3 of the Vermont Constitution because it promotes religious use of property over nonreligious use. We note, however, that plaintiffs rely exclusively on case law interpreting the United States Constitution and do not maintain that the Vermont Constitution affords more protection to them in this case.[3] Accordingly, we decide the case only under federal constitutional law principles.

The First Amendment to the United States Constitution provides in relevant part that "Congress shall make no law respecting an establishment of religion." The prohibition expressed in the Establishment Clause applies to the states by operation of the Fourteenth Amendment. See *Everson v. Board of Educ.*, 330 U.S. 1, 8 (1947).

Twenty-eight years ago, the Supreme Court in *Walz v. Tax Commission of City of New York*, 397 U.S. 664 (1970), declined to invalidate on Establishment Clause grounds New York's property tax exemption for religious institutions. The applicable statute exempted not only property belonging to religious institutions but also to realty owned by entities organized for any of the following diverse purposes: "the moral or mental improvement of men and women, or for religious, bible, tract, charitable, benevolent, missionary, hospital, infirmary, educational, public playground, scientific, literary, bar

---

[3] In fact, plaintiffs note in their reply brief that amici curiae assert that the protections of the First Amendment are greater than those of Chapter I, Article 3 and state that they "agree on this point."

association, medical society, library, patriotic, historical or cemetery . . . ." *Id.* at 667 n.1. Noting that the purpose of such an exemption was "neither the advancement nor the inhibition of religion," the Court observed that New York had not "singled out one particular church or religious group or even churches as such" but instead had included houses of worship "within a broad class of property" owned by groups that foster the moral or mental improvement of the community and are generally considered "beneficial and stabilizing influences in community life." *Id.* at 672-73. Thus, the New York statute met what has come to be known in First Amendment jurisprudence as the "secular purpose" test. See *Agostini v. Felton*, 521 U.S. 203, 218, 117 S. Ct. 1997, 2008 (1997) (citing *Lemon v. Kurtzman,* 403 U.S. 602 (1971)).

In the Supreme Court's view, two other factors supported its analysis of the statute's purpose. First, the statute created an exemption from taxation rather than direct monetary support: "We cannot read New York's statute as attempting to establish religion; it is simply sparing the exercise of religion from the burden of property taxation levied on private profit institutions." *Walz*, 397 U.S. at 673. Second, property tax exemptions of the type represented in the New York statute were in existence from the earliest days of the United States: "[A]n unbroken practice of according the exemption to churches, openly and by affirmative state action, not covertly or by state inaction, is not something to be lightly cast aside." *Id.* at 678.

In terms of secular purpose, § 462 cannot be meaningfully distinguished from the statute analyzed in *Walz*. Section 462 includes property dedicated to "pious" use among a broad class of property the use of which is generally considered sufficiently benevolent to warrant a perpetual exemption from adverse possession claims or prescriptive easements. In the early case of *Society for the Propagation of the Gospel v. Town of Pawlet*, 29 U.S. (4 Pet.) 480, 505 (1830), the United States Supreme Court described the policy behind the Vermont statute:

> There are good grounds why statutes of limitation should not be applied against grants for public, pious, and charitable uses, when they may well be applied against mere private rights. The public have a deep and permanent interest in such charities, and that interest far outweighs all considerations of mere private convenience.

This policy is reflected in Chapter II, § 68 of the Vermont Constitution, which protects pious activities as part of a broader class of benevolent objectives:

> All religious societies, or bodies of people that may be united or incorporated for the advancement of religion and learning, or for other pious and charitable purposes, shall be encouraged and protected in the enjoyment of the privileges, immunities, and estates, which they in justice ought to enjoy, under such regulations as the general assembly of this state shall direct.

The other factors enumerated in *Walz* are also present here. There is no direct governmental support for religious activities; instead, the statute provides an exemption from a law that might inhibit religious activities. The specific statute before us was adopted in a form substantially identical to its present form in 1801, see Laws of 1801, at 13, but its substance derives from laws adopted before our statehood. See *University of Vermont v. Reynolds*, 3 Vt. 542, 555-56 (1831) (quoting "quieting act" passed in 1785 and discussing various enactments applicable between 1785 and 1801).

As plaintiffs conceded at oral argument, the church's property would also qualify for protection under § 462 because it is dedicated to "charitable use." Although it may be possible in theory that the use of a property could be pious without being charitable, for purposes of this case the reference to "pious" use in § 462 simply serves to clarify that a church is part of that broad class of properties — ones dedicated to charitable uses — that enjoys the statute's protection. At least as applied here, the purpose of § 462 is unmistakably secular.

Plaintiffs argue, however, that the class of beneficiaries at issue here is narrower than the one at issue in *Walz* and that, as a result, we cannot find a secular purpose. Although the exemption in Vermont of "public, pious or charitable" uses is more general than that in the New York statute discussed in *Walz*, it is not clear whether one is broader than the other. In any event, we do not agree that our analysis should turn on a count of enumerated benefitted categories. In the one case following *Walz* where the United States Supreme Court found that an exemption for religious activities offended the Establishment Clause, the Court held that the necessary breadth of the beneficiary class depended on the "secular aim" involved. See *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 15 (1989). In reaching its decision, however, the Court stated a very narrow rule:

> [W]hen government directs a subsidy exclusively to religious organizations that is not required by the Free Exercise Clause and that either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion . . ., it "provide[s] unjustifiable awards of assistance to religious organizations" and cannot but "conve[y] a message of endorsement" to slighted members of the community.

*Id.* at 15 (quoting *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,* 483 U.S. 327, 348 (1987) (O'Connor, J., concurring)).

Under this standard, the Court struck down as too narrow a Texas statute that provided a sales tax exemption to periodicals only if they were published by a religious faith and consisted of writings teaching the faith or sacred to the faith. *Id.* at 17; see also *In re Springmoor, Inc.,* 498 S.E.2d 177, 182 (N.C. 1998) (property tax exemption for home for the aged, sick or infirm, only if owned by religious or Masonic organization, is too narrowly drawn and has no legitimate secular objective). We have no difficulty in holding that § 462 is sufficiently broad to implement its purpose, as expressed in *Society for the Propagation of the Gospel,* and to show a secular objective that justifies the preference it contains. See *Walz,* 397 U.S. at 696 (Harlan, J., concurring) (critical question is whether "circumference of legislation encircles a class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter").

As noted in *Walz,* and as refined in the Supreme Court's later cases, discerning the requisite secular purpose does not end the inquiry. *Id.* at 674. Whatever a statute's purpose, it runs afoul of the Establishment Clause if its "effect" is that of either "advancing or inhibiting religion." *Agostini,* 521 U.S. at 223, 117 S. Ct. at 2010. Further, the statute is unconstitutional if it fosters "an excessive government entanglement with religion." *Lemon,* 403 U.S. at 613 (quoting *Walz,* 397 U.S. at 674).

We are unable to discern any sense in which § 462 either advances or inhibits religion. "A law is not unconstitutional simply because it *allows* churches to advance religion, which is their very purpose." *Amos,* 483 U.S. at 337 (emphasis in original). Rather, the relevant question is whether "the *government itself* has advanced religion through its own activities and influence." *Id.* (emphasis in original). Here, plaintiffs generate no evidence to suggest that the effect of

§ 462 is any different from its purpose, which is not to advance religion but to shield real property devoted to charitable purposes from adverse ownership claims.

Nor is there any basis for concluding that § 462 fosters an excessive government entanglement with religion. "Not all entanglements . . . have the effect of advancing or inhibiting religion. Interaction between church and state is inevitable . . . ." *Agostini*, 521 U.S. at 233, 117 S. Ct. at 2015 (noting that "some level of involvement" between church and state has always been constitutionally permissible). Here, the only basis advanced by the plaintiffs for a finding of excessive entanglement is that courts are the ultimate arbiters of whether § 462 defeats what would otherwise be a meritorious claim to an interest in property. This exact same "entanglement" was present in *Walz* by virtue of the judicial determination as to whether the property owner was entitled to the tax exemption; that reality was not fatal to the constitutionality of the exemption. As pointed out by the amici, if a court's analysis and decision-making constituted "excessive government entanglement" then religious institutions would never have recourse in court as to any dispute in which their religious status was in issue. See *Jones v. Wolf*, 443 U.S. 595, 602 (1979) (courts may resolve dispute over church property, but only if case does not turn on "religious doctrine and practice").

Plaintiffs further posit that judicial enforcement of § 462 creates an entanglement that is excessive because a court may be called upon to determine whether a religious institution's particular use. of the property in question is truly "pious" within the meaning of the statute. Assuming arguendo that judicial determinations of piety would excessively entangle the courts in matters of religion, it is a problem we simply do not confront here. There was no issue in the trial court over whether the church's property is devoted to pious use, and, as already noted, plaintiffs have conceded that the property is also used for charitable purposes within the meaning of the statute. Because we avoid construing a Vermont statute so as to render it unconstitutional whenever that is "fairly and reasonably possible," see *In re Delinquency Proceedings Concerning a Certain Juvenile*, 129 Vt. 185, 189, 274 A.2d 506, 509 (1970), we must assume for present purposes that any property belonging to a religious institution would be "pious" within the meaning of § 462. No reason presents itself to conjure the specter of judicial incursions into the realm of religious doctrine.

■ In sum, the principles first laid out in *Walz* and subsequently elaborated upon in cases from *Lemon* to *Agostini* make clear that § 462, as applied in the circumstances in this case, does not violate the Establishment Clause. The Vermont Legislature has shielded both religious institutions and the more broad category of charitable organizations from adverse property claims. An entity that qualifies as either may invoke the protection without implicating the First Amendment.

### III. Presumed Grant

As they did in the trial court, plaintiffs also seek to advance a theory here by which they would acquire an easement regardless of the operation of § 462. This is the so-called doctrine of presumptive (or lost) grant, which we endorsed most recently in *University of Vermont v. Carter*, 110 Vt. 206, 3 A.2d 533 (1939). Like the present case, *Carter* involved a situation in which § 462 operated to exempt the holder of legal title — there, the University of Vermont — from the otherwise-applicable limitation period for actions to recover possession. *Id.* at 210, 3 A.2d at 535. We nevertheless held that § 462 would not defeat plaintiffs' claim of adverse possession because, in the circumstances, "a grant can be presumed to the defendants or some of their predecessors in title from the plaintiff." *Id.* at 216, 3 A.2d at 537. Here, while acknowledging the principle articulated in *Carter*, the trial court refused to presume that the church had granted an easement to plaintiffs. We agree with the trial court, although for somewhat different reasons.

Some historical background is useful. Like many arcane and seemingly anomalous principles in the law of real property, the presumed grant has its roots in the common law as developed in England prior to the American Revolution. Statutes enacted by Parliament in 1540 and 1623 had the effect of imposing what would ultimately come to be a twenty-year limitation period on ejectment claims. See J. Curtis, *Reviving the Lost Grant*, 23 Real Prop., Prob. & Tr. J. 535, 536-37 (1988). The advent of this requirement was relevant only to adverse possession and not easements by prescription, since the existence of a valid ejectment claim is dispositive of the issue of who may lawfully possess (as distinct from simply use) the property. See *id.* at 537. The law of prescriptive easements developed along different lines:

> [W]ithout regard to a limitation period, an incorporeal claim was validated by proof of use alone. The requisite period of

> use has varied from time to time. Originally, the period may
> have been either 1066 (the year of the Norman Conquest) or
> a period beyond the memory of living persons. Eventually,
> the date from which the use had to be exercised was fixed as
> 3 September 1189, often described as the time of legal
> memory. There it remained, despite the statutes of 1540 and
> 1623, because the English courts refused to apply those
> enactments to cases involving incorporeal claims.

*Id.* at 537 (footnotes omitted). Proving that a particular use had
existed since 1189 grew impractical to say the least, and, as a
consequence, courts adopted the practice of presuming, based on a
showing of longtime use, that an actual grant of the right had been
made but the instrument granting the right had simply been lost. See
*id.* at 537-38; see also Restatement (Third) of Property (Servitudes)
§ 2.16 cmt. a (Tentative Draft No. 3, 1993); R. Cunningham, et al.,
The Law of Property § 8.7, at 451 (1984); Note, *Prescription Adrift
in a Sea of Servitudes: Postmodernism and the Lost Grant*, 43 Duke
L.J. 845, 863 (1994) (lost grant presumption arose "to avoid the
inconvenience of searching for an octogenarian with a particularly
fertile memory"). Eventually, English law fixed twenty years as the
period of use that would be sufficient to establish the presumption of
a lost grant. See Curtis, *supra*, at 536-37; see also 4 H. Tiffany, The
Law of Real Property § 1191, at 960 (3d ed. 1975) (noting that this
period was established by "analogy to the period of limitation").

Although, under the English precedents, the presumption of a lost
grant applied only to incorporeal claims — that is, nonpossessory
interests — its adoption in the United States often did not include
that limitation. Thus, *Carter* and the Vermont cases cited therein
applied the presumption of a lost grant to a possessory interest
creating an alternative method of accomplishing the purpose of
adverse possession that did not depend on the running of a limitation
period. See Curtis, *supra*, at 542-43 (despite analogy to limitation
period for ejectment actions, "in reality the requisite period may be
longer or shorter than the limitation period."). Meanwhile, our
decisions blended the concepts of adverse possession and prescriptive
easement. See *Community Feed Store*, 151 Vt. at 155, 559 A.2d at
1070 (elements of prescriptive easement and adverse possession
claims "essentially the same under Vermont law"); *Russell v. Pare*,
132 Vt. 397, 401, 321 A.2d 77, 80 (1974) (distinction between adverse
possession and prescriptive easement "not always clear" but the

applicable rules are "in harmony" and have common roots in doctrine of presumed grants and analogy to statute of limitations).

It is fair to say that the doctrine of presumed grants is presently under siege. The American Law Institute, in its tentative draft of the third Restatement of Property, concedes that presumed grants "played a substantial role in American law for many years," but takes the position that the "vestigial remnants" of the doctrine should now be "eradicated." Restatement (Third) of Property (Servitudes) (Tentative Draft No. 3, 1993) at Introduction. According to the drafters, other historical doctrines "provide a satisfactory explanation" for the law of prescriptive easements. *Id.* Or, as other commentators have noted,

> [t]he blending of prescription and adverse possession [in American law], whether right or wrong in history and theory, has in fact made title arise simply by the running of the applicable statute of limitations. There is no need to presume usage back to 1189 (in America?) and so no need to presume a lost grant. Except for historical purposes, discussions of the subject should drop out of the legal literature.

Cunningham, *supra*, § 8.7, at 451.

Defendants urge us to eliminate presumed grants from our law as wholly inconsistent with the protection to public, pious and charitable uses that the Legislature adopted in 12 V.S.A. § 462. That position has some appeal. If, as we said in *Russell*, the theories underlying both prescriptive easements and adverse possession lead to the conclusion that "the applicable statute of limitations [is] a part of the doctrine" underlying both kinds of claims, *Russell*, 132 Vt. at 401, 321 A.2d at 81, and given that the Legislature has so plainly declared that what is essentially an infinite limitation period should protect owners of land dedicated to public, pious or charitable uses as well as the state as landowner, the presumed grant doctrine in *Carter* could plausibly be discarded as a mischievous anachronism.

We need not take that step at this time. As discussed above, a statutory exemption from the limitation period has existed for public, pious and charitable uses at least since 1785, and the 1831 decision in *University of Vermont v. Reynolds*, 3 Vt. 542 (1831), held that the presumption of a lost grant applied to such uses despite the statutory protection. Although we are "not slavish adherents to stare decisis," *State v. Berini*, 167 Vt. 565, 566, 701 A.2d 1055, 1056 (1997), we do not "lightly overrule settled law especially where it involves construction

of a statute which the legislature could change at any time." *Estate of Girard v. Laird*, 159 Vt. 508, 515, 621 A.2d 1265, 1269 (1993). Here, our construction of the statute has existed, without legislative change, for almost two centuries.

We do believe, however, that the doctrine of presumed grants is at least in need of a modern restatement, at least as applied to uses covered by § 462. "[T]here is a presumption that the Legislature does not intend to enact meaningless legislation . . . [and], thus, when we construe a statute, we must do so in a manner that will not render it ineffective or meaningless." *State v. Yorkey*, 163 Vt. 355, 358, 657 A.2d 1079, 1080 (1995) (citations omitted). The result urged upon us by the plaintiffs would render § 462 a meaningless nullity by allowing a party with a claim adverse to an entity protected by the statute to defeat it by simply repeating the magic words: presumed grant. We cannot accept a doctrine, the only remaining purpose of which is evading a statutory protection in all cases where it would arise.

The key to any modern application of the doctrine of a presumed grant is that it involves a presumption. As noted by a contemporary defender of the presumed grant doctrine, a decision like *Carter*, applying the theory in the face of the legislative determination made by § 462, "assume[s] that legislators know the difference between a statute of limitation and a rule of evidence and that legislative qualifications to limitation periods do not repudiate this ancient evidentiary rule." Curtis, *supra*, at 549. Our cases reflect the view that Vermont's doctrine of presumed grants is indeed a rule of evidence and involves a presumption, although the nature of that presumption has been at times ill defined. See *Trustees of Caledonia County Grammar Sch. v. Howard*, 84 Vt. 1, 11-15, 77 A. 877, 879-82 (1910) (discussing when the presumption of a lost grant arises); *Tracy v. Atherton*, 36 Vt. 503, 511-13 (1864) (discussing nature of presumption of lost grant); *Townsend v. Administrator of Estate of Downer*, 32 Vt. 183, 205 (1859) (noting, in discussion of lost grant presumption, that "[s]ometimes these presumptions are held to be conclusive, at others open to be rebutted" and concluding that "[t]he line between conclusive and disputable presumptions is not well defined"); *Reynolds*, 3 Vt. at 560 (long standing possession was "evidence" that possession was commenced under title and jury should have been instructed, inter alia, "to presume an antecedent grant").

In *Tyrrell v. Prudential Ins. Co. of America*, 109 Vt. 6, 23, 192 A. 184, 192 (1937), this Court attempted to bring method and order to our law on presumptions after concluding "that a false doctrine has

dominated the subject and persisted in our law too long." We went on to hold that a disputable presumption is "locative, merely" — i.e., "[i]t points out the party on whom lies the duty of going forward with evidence on the fact presumed" — and of itself contributes "no evidence and has no probative quality." *Id.* at 23, 192 A. at 192. By Vermont Rule of Evidence 301(a), we have now adopted the policy that all presumptions in civil cases are *Tyrrell* "bursting bubble" presumptions "except as otherwise provided by law." See Reporter's Notes to V.R.E. 301 (noting that, under "bursting bubble" theory, "a presumption shifts only the burden of production, losing its mandatory effect as soon as evidence sufficient to support a finding of the nonexistence of the presumed fact is introduced."). The exception "recognizes the possibility that for reasons of policy in a particular situation, the legislature, by statute, or the Court by judicial decision, may give different effect to a presumption than that accorded by the rule." *Id.*

We believe that much of the lack of definition in our cases about the presumption of a lost grant involves the doctrinal conflicts resolved by *Tyrrell.* See *id.* (contrasting "bursting bubble" with other formulations of presumption theory); *Tyrrell,* 109 Vt. at 22-23, 192 A. at 191-92 (discussing inconsistent presumption theories in prior Vermont cases). Despite the then-existing confusion, this Court noted in *Tracy,* 36 Vt. at 513, that "whether the presumption arising from the length of possession is one of law, or one of fact, . . . whichever it may be it is liable to be rebutted in various ways." Since the presumption could be rebutted, it was subject to the "bursting bubble" rule of *Tyrrell* and is covered by Rule 301(a).[4] We have no policy reason to reach a different result, particularly where § 462 is involved. Indeed, treating the presumption of a lost grant as a rebuttable, "bursting bubble" presumption is fully consistent with the policy behind § 462.

Although the trial court did not analyze the presumption of a lost grant under V.R.E. 301, we have no doubt that it reached the correct conclusion. The trial court declined to invoke the presumed grant doctrine, concluding:

---

[4] The only lost grant case after *Tyrrell* is *Carter.* Although *Carter* definitively held that 12 V.S.A. § 462 did not foreclose the invocation of the presumed grant theory in a case involving property covered by the statute, left unresolved was the applicability of *Tyrrell* in such a situation. The Court stated: "In view of the concluding statement in the agreed statement of facts . . . it is not necessary to determine the nature of the presumption, nothing appearing in the agreed statement to rebut or repel the same." 110 Vt. at 216, 3 A.2d at 537.

Plaintiffs are not entitled to the presumption of the grant of church property merely because their business activities currently enjoy a greater attendance than church services. Moreover, the plaintiffs' commercial use of the driveway has altered and swelled with the growth of their business to such a degree that it fundamentally affects the church's pious use of its property. The noise and fumes that accompany the comings and goings of buses and motorcoaches transporting up to 6,000 customers daily to the mill excessively intrude on church uses of its land.

Accordingly, the trial court determined that presuming a lost grant "would be unjust and unreasonable where plaintiffs' commercial use has been in common with church's religious use but has steadily expanded to overwhelm it."

■ We reach the same result under V.R.E. 301. The church's title to the property traces to a conveyance expressly providing that it shall use and occupy the land for religious purposes and no other. The trial court determined that the church's grantor retained a right of reentry in certain circumstances.[5] We believe that the existence of the right of reentry was sufficient to rebut any presumption of a lost grant because it establishes that the church would have put its title to the driveway at risk if it gave plaintiffs, or their predecessors in title, an easement to use the driveway for commercial purposes. Cf. *Reynolds*, 3 Vt. at 560 ("If it was necessary in this case to presume a deed from the trustees of the university to establish the defendant's claim, it would not be established, as the trustees never had any power to convey by deed."). Because any presumption of a lost grant was rebutted and was no longer in the case, see V.R.E. 301(c)(3) (providing that issues involving rebutted presumption are presented to factfinder "on the evidence as a whole without reference to the presumption"), the trial court properly applied 12 V.S.A. § 462 to resolve the dispute in defendant's favor.

## IV. Laches

Finally, plaintiffs contend that the trial court erred in not applying the equitable doctrine of laches so as to bar any effort by the church to defeat plaintiffs' claim to an easement in the driveway. We disagree.

---

[5]The issue of the grantor's right of reentry was actually raised by plaintiffs, who sought to enforce it and oust the church from possession of the realty. The trial court rejected this argument. We agree that it does not defeat the church's current title.

"Laches is the failure to assert a right for an unreasonable and unexplained period of time when the delay has been prejudicial to the adverse party, rendering it inequitable to enforce the right." *In re Vermont Elec. Coop.*, 165 Vt. 634, 635, 687 A.2d 883, 884-85 (1994) (citation omitted). The delay must be "unexcused" and prejudicial. *In re Estate of Neil*, 152 Vt. 124, 132, 565 A.2d 1309, 1314 (1989). "[L]aches is so much a matter of discretion by the lower court that its action will not be disturbed unless clearly shown to be wrong." *Vermont Elec. Coop.*, 165 Vt. at 635, 687 A.2d at 885 (citation and internal quotation marks omitted). The trial court did not commit clear error.

■ We are unable to agree with plaintiffs that they suffered the requisite prejudice. Any delay by the church in asserting its exclusive right to possess the driveway actually benefitted rather than harmed plaintiffs because it tended to bolster their claim of a prescriptive easement. Moreover, even if prejudice were established on this record, we cannot find that church's delay in asserting its rights was unexcused. Because of § 462, it had no legal obligation to raise its rights at any particular time. It could consent to shared use of the driveway until the frequency and intensity of plaintiffs' use became inconsistent with the functioning of the church. Laches is not an elixir that automatically relieves landowners of the effects of any erroneous assumptions they may make as they use and develop their property — particularly in the face of public policy determinations that conflict with the assumptions in question. See, e.g., *State v. Central Vermont Ry.*, 153 Vt. 337, 353, 571 A.2d 1128, 1136 (1989) (holding that laches would not bar claim deriving from prerevolutionary public trust doctrine). Assuming arguendo that there was both some delay and some prejudice here, the trial court still acted within its sound discretion.

## V. Conclusion

12 V.S.A. § 462, which prevents the statute of limitations period from running against the church's claim of exclusive rights to the church's north driveway, is neither constitutionally infirm nor evaded by the doctrine of presumed grants in the circumstances of the case. The trial court correctly so concluded and did not abuse its discretion in declining to change the result based on laches. Accordingly, we leave undisturbed the trial court's ultimate determination that the church owns the property at issue free of any claim by plaintiffs and

that plaintiffs have no right to use or to cross over any part of the church's premises without its permission.

*Affirmed.*