2013 VT 100



Roy, Hirschbuhl, Barr, et al. v.
Woodstock Community Trust, Inc. (2011-265)

 

2013 VT 100

 

[Filed 01-Nov-2013]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.

 

 


 2013 VT 100
 
  


 No. 2011-265
 
  


 David E. Roy, Mary R. Roy,
 Michael Hirschbuhl, Tonia Hirschbuhl, Richard Roy, Roberta Roy, Glenn Barr,
 et al.
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
      v.
 
 
 Superior Court, Windsor Unit,
 
 
  
 
 
 Civil Division
 
 
 Woodstock Community Trust, Inc.
 
 
  
 
 
  
 
 
 September Term, 2012 
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Katherine
 A. Hayes, J.
 
 
  
 
 Kaveh S. Shahi of Cleary Shahi & Aicher, P.C., Rutland, for
Plaintiffs-Appellants/

  Cross-Appellees.

 

Robert S. DiPalma and Kristina M. Roomet of Paul Frank +
Collins P.C., Burlington, for 

  Defendant-Appellee/Cross-Appellant.

 

 

PRESENT:  Reiber, C.J., Dooley, Skoglund, Burgess and
Robinson, JJ.

 

 

¶ 1.            
DOOLEY, J.     This case arises out of a proposed
housing development in West Woodstock, Vermont.  It is not the first case
to come before us related to this development.  In Roy v. Woodstock
Community Trust and Housing Vermont PRD, 2012 VT 87, ___ Vt. ___, 60 A.3d
686, we affirmed the permits for the project granted by the town development
review board and the district environmental commission and affirmed by the
environmental division of the superior court.  This appeal, brought by the
owners of abutting properties to the land in question—David and Mary Roy,
Michael and Tonia Hirschbuhl, Richard and Roberta Roy, Glenn and Charlotte
Barr, Richard and Shirley Burroughs, and Jay Smith—presents a number of more
narrow questions related to easements and other property rights.  It also
includes a cross-appeal by Woodstock Community Trust, Inc. (WCT) of a finding
of the superior court related to those same property rights.  We affirm in
part and reverse in part.

¶ 2.            
The property in question consists of two abutting parcels located along
Route 4 in West Woodstock.  One of the parcels is a half-acre lot
with a building on it, known as the Grange Hall (“parcel 1”), and the other a
7.5-acre parcel that contains no building but includes a parking lot as well as
the driveway that provides access to the property from Route 4 (“parcel
2”).  

¶ 3.            
WCT is a nonprofit corporation; part of its mission is to promote
affordable housing within Woodstock.  It purchased both of these parcels
in 2005.  It took title subject to three water easements that run across
the property, owned by plaintiffs Shirley and Richard Burroughs, Roberta and
Richard Roy, and Jay Smith.  Smith also maintains that he owns spring
rights on the property.  

¶ 4.            
Plaintiffs brought this case in 2007, while the project was still under
review for permitting approval, alleging a wide variety of property-right
violations.  The trial court dismissed one claim, decided others on
partial summary judgment, and sent the remaining claims to trial.  During
the course of the jury trial, the court granted a number of Vermont Rule of
Civil Procedure 50 motions for judgment as a matter of law, leaving only one
question for the jury: whether the proposed project unreasonably interfered
with Smith’s spring rights—rights that the court had found, after the close of
evidence at trial, to exist as a matter of law.  

¶ 5.            
In May 2011, the jury found for Smith, and a judgment was entered in
July 2011.   After the trial, both parties submitted proposed
judgment orders.  WCT requested an evidentiary hearing, but the hearing
did not take place because plaintiffs filed a letter with the trial court
requesting the prompt issuance of a final judgment order sufficient to allow
Smith and the other plaintiffs to appeal.  The trial court, in its words,
“[i]nterpret[ed] this to mean that plaintiff was no longer pursuing injunctive
relief, . . . [and] issued a final judgment order stating
simply that the proposed development unreasonably interfered with plaintiff’s
spring rights.”    

¶ 6.            
After plaintiffs filed their appeal in this Court, WCT filed a renewed
motion for judgment as a matter of law together with a motion to alter or amend
the judgment or for new trial and obtained a remand order from this Court
authorizing review by the trial court of those motions.  The trial court
held an evidentiary hearing on the motions in November 2011 and considered
WCT’s proposal to modify its plans and found that the project as modified no
longer interfered with Smith’s spring rights.  It therefore issued an
amended judgment order on December 30, 2011, ordering WCT to lay a polyethylene
sleeve and pipe on its property to allow Smith access to his spring rights,
calling this “an appropriate equitable remedy for the interference that was
found by the jury.”   

¶ 7.            
On appeal, plaintiffs argue that: (1) the trial court lacked
jurisdiction post-judgment to hold an evidentiary hearing about interference
with Smith’s spring rights; (2) Smith was denied his right to a jury trial in
that evidentiary hearing; (3) the equitable remedy that resulted from that
hearing was a de facto overturning of the jury verdict; (4) Smith was entitled
to injunctive relief as well as declaratory relief as a result of the jury
verdict; (5) the trial court erred by allowing, on summary judgment, the
unilateral relocation of the Roys’[1]
and Burroughs’ water easements; (6) the trial court erred by denying, on summary
judgment, adverse possession claims by David Roy and the Hirschbuhls; (7) the
trial court erred by denying, also on summary judgment,
boundary-by-acquiescence claims by the Roys and Hirschbuhls; (8) the jury
should have been allowed to decide if the new use of an easement belonging to
WCT on David Roy’s property exceeded the original easement as granted to its
predecessor; and (9) the trial judge erred in dismissing plaintiffs’ nuisance
claims.  WCT, for its part, cross-appeals the trial court’s finding as a
matter of law that Smith possessed a current spring right on WCT’s property.

¶ 8.            
Further facts related to the history and geography of the properties
will be presented as necessary in the sections below.  Our treatment of
the various issues is not chronological with respect to when the appealed
decisions were made, but rather commences with the cross-appeal and then tracks
the order in which plaintiffs present their claims of error in their brief.

¶ 9.            
We begin with WCT’s cross-appeal regarding Smith’s purported spring
rights.  After plaintiffs’ case, WCT made a motion for judgment as a
matter of law that Smith had no spring rights on WCT’s property.  See
V.R.C.P. 50(a).  The court denied the motion, and counsel for
WCT renewed it after the close of evidence.  At that time, counsel for
plaintiffs made his own Rule 50 motion for judgment as a matter of law that
Smith did have spring rights.  The trial court ruled for
plaintiffs, granting their Rule 50 motion on this issue and denying WCT’s Rule
50 motion.  After entry of judgment, WCT properly filed a renewed motion
for judgment as a matter of law, preserving its right to appeal the denial of
its motion.  See V.R.C.P. 50(b).  It filed a cross-appeal
appealing the denial of its Rule 50 motion.

¶ 10.        
Rule 50 explains:

 
If during a trial by jury a party has been fully heard on an issue and there is
no legally sufficient evidentiary basis for a reasonable jury to find for that
party on that issue, the court may determine the issue against that party and
may grant a motion for judgment as a matter of law against that party with
respect to a claim or defense that cannot under the controlling law be
maintained or defeated without a favorable finding on that issue.

 

V.R.C.P. 50(a)(1). 
We review judgments as a matter of law under the same standard as the trial
court: evidence is viewed in the light most favorable to the nonmoving party,
excluding the effects of any modifying evidence.  Gero v. J.W.J. Realty,
171 Vt. 57, 59, 757 A.2d 475, 476 (2000).  When the appeal is of a denial
of a motion for judgment as a matter of law, the trial court’s ruling will be
upheld if any evidence fairly or reasonably supports a lawful theory of the
nonmoving party.  Northshire Commc’ns, Inc. v. AIU Ins. Co., 174
Vt. 295, 298, 811 A.2d 216, 219-20 (2002).  Under these standards, we
reverse the superior court decision.  Not only do we find that the court
erred in granting plaintiffs’ motion, we find that it erred in denying WCT’s
motion because there is no legally sufficient evidentiary basis to find that
Smith has spring rights on WCT’s property. 

¶ 11.        
The trial court made its determination that Smith has spring rights
based on his testimony at trial, as well as documentary evidence of deeds
demonstrating the chain of title to the property.  There is no dispute
over the following evidence.  Smith and his then-wife purchased their
property in 2000.  There was no mention of spring rights in the deed that
conveyed the property to them.  The property is now owned only by Smith
because the couple divorced and his ex-wife executed a quitclaim deed giving
him all rights to the property.    

¶ 12.        
The purported spring rights came from a 1915 warranty deed of Charles W.
Smith to F. Guy Smith.  Plaintiff is not related to either of these
individuals.  F. Guy Smith was at the time—along with his wife Ida
Smith—the owner of the property now owned by plaintiff Smith, pursuant to a
deed of 1915 from Mary Vaughan to the two of them.  The language of the
deed is as follows:

I . . . do
freely give, grant, sell, convey and confirm unto the said F. Guy Smith and his
heirs and assigns forever, a certain piece of land and Spring in Woodstock in
the County of Windsor and State of Vermont, described as follows, viz: A Spring
and the water thereof and therein, located at the foot of the hill on the
Grantor’s Meadow in West Woodstock eight (8) feet westerly of the division
fence between land of the Grantor and land of Marble and Southerly of and
opposite to a point in said Marble’s part of said fence twenty one (21) feet
Northerly of the point of the division of said fence, together with the
sufficient land around said Spring as may be necessary to use in preserving,
maintaining and repairing the well or reservoir, now built around said Spring,
and the right to maintain, repair, and relay when necessary the aqueduct or
pipe now laid through the land of the Grantor from said Spring to premises of
the said F. Guy Smith, doing no unnecessary damage and paying for such
unavoidable damage as may be occasioned in repairing and maintaining said well
or reservoir and water pipe therefrom—Also the right in case said Spring should
hereafter fail to supply as much water as it now does, to take, dig out, and
fit up with a proper well or reservoir about the same, and connect with the
first above described Spring and aqueduct and other Spring in the vicinity of
said first mentioned Spring, with the same right to improve, maintain and use
the same in all respect[s] as granted with the Spring first above mentioned.

 

¶ 13.        
Since the time of that deed, the property that was then owned by F. Guy
Smith has changed hands a number of times.  In 1919, the decree of
distribution for F. Guy Smith’s estate deeded four parcels, presumably
including the one now owned by Jay Smith, to his wife Ida Smith, together with
“other property which is now a part of said estate if any there is.” 
There are no references to book and page of the deeds and none to the land in
question or to the spring rights.  

¶ 14.        
The next transfer was in 1938.  In that year, the decree of
distribution for Ida Smith’s estate conveyed the property now owned by Jay
Smith to Allen Barrett and Mary Anne Shaw, describing the property as “all and
the same premises conveyed to F. Guy and Ida V. Smith by Mary E. Vaughan,” and
including the correct book and page reference.  The decree does not refer
to the spring rights, either by specific reference to book and page of the
spring rights deed, or generally.  There is also no language such as “with
all the privileges and appurtenances thereto.”

¶ 15.        
In 1955, Allen Barrett and Mary Anne Shaw Galloway, together with their
spouses, conveyed the property to Annie L. Kenefick, making reference to the
warranty deed conveying the spring rights.  In 1973, Annie L. Kenefick and
her spouse conveyed the property to George J. Schuetz and Nancy L. Schuetz,
also making reference to the spring rights.  In 1994, George J. Schuetz
conveyed the property to Nancy L. Bernet (formerly Schuetz) by quitclaim
pursuant to a divorce, referencing the previous conveyance by Annie L.
Kenefick.  In 2000, Nancy Bourdon (formerly Schuetz and Bernet) conveyed
the land to Gretchjen T. Smith and Jay W. Smith, referencing the previous two conveyances. 
Finally, in 2001, Gretchjen T. Smith conveyed the property to Jay W. Smith by
quitclaim, referencing the previous conveyance.    

¶ 16.        
Smith’s current position is that he is the owner of the spring rights.
 He believes that he has the right to tap into the wet areas in the
vicinity of the original spring described in the 1915 deed, and to use the land
necessary to have that spring tapped, although he professes no current plan to
do so.  He testified at trial that he had been over onto the property soon
after he purchased his land to try to find the spring, but that he had not
found a spring, any water coming out of the ground, a reservoir, aqueduct or
pipes—merely a “wet spot.”[2] 
Smith conceded, however, that he did not know whether the wet spot was caused
by water coming up out of the ground or water running off the hill at the back
of the property.   

¶ 17.        
In order for plaintiff Smith to own the spring rights, each conveyance
in the chain of title, after the spring rights deed, must include them. 
Conversely, to find as a matter of law that plaintiff Smith does not own
the spring rights, we need find only one conveyance where there is no “legally
sufficient evidentiary basis for a reasonable jury” to find that rights were
successfully transferred.  V.R.C.P. 50(a)(1).  If we find such a
conveyance, there is no need to consider any of the other conveyances, as the
chain was broken and the spring rights cannot have been passed down to plaintiff
Smith.  We therefore focus, as WCT urges us to do, on the “weakest link”
in this chain of conveyances: the 1938 decree of distribution of the estate of
Ida Vaughan Smith.  

¶ 18.        
The trial court found generally that each conveyance passed on the
spring rights, but did not focus on the 1938 decree of distribution or explain
its reasoning with respect to each conveyance.  In its oral decision, the
trial court did not explain its conclusion beyond stating, “I do think, as a
matter of law, that he has established that the—the appurtenant easement in
question attaches to his property and he has a spring right and I’m prepared to
instruct the jury to that effect . . . .”  Earlier,
however, the court alluded to its reasoning, citing a case where this Court
found that a warranty deed that referenced “appurtenances” in the deed included
spring rights.  Sargent v. Gagne, 121 Vt. 1, 4, 147 A.2d 892, 895
(1958).  The court did not, however, specify to which of the conveyances
it was applying this precedent, and the decree of distribution of the estate of
Ida Vaughan Smith does not include any such reference to “appurtenances.” 

¶ 19.        
“Land does not pass as a mere appurtenance to other land; and,
consequently, no portion of the highway, or stream, will be conveyed, unless
the instrument of conveyance can, by reasonable construction, be made to
include it.”  Cole v. Haynes, 22 Vt. 588, 590 (1849).  We must
therefore evaluate whether the decree of distribution can, “by reasonable
construction, be made to include” the spring rights.   

¶ 20.        
It cannot.  Plaintiffs represent that the decree of distribution of
the estate of Ida Vaughan Smith “transferred all the interests of the estate,”
but that language is nowhere to be found in the decree.  Rather, the
reference is only to the location of the property, “being all and the same
premises” conveyed to the Smiths by the original deed, with no reference to the
later warranty deed granting spring rights and no addition of “privileges and
appurtenances.”  The residue of Ida Vaughan’s Smith estate was described
as “amounting to $15,411.08 in cash or its equivalent,” and was split between
the two recipients of the land and another cousin, Chauncey Shaw.   

¶ 21.        
Plaintiffs cite two cases in support of the trial judge’s decision that
the spring rights were passed on as an “appurtenance” to the property. 
The first, Swazey v. Brooks, 34 Vt. 451, 453 (1861), asks: “Was such a
[water] right conveyed by the defendant’s deed to Joseph Swazey?  This
question must turn upon the meaning and operation of the word appurtenances
as used in the habendum of the deed.”  The second, Barrett v.
Kunz, 158 Vt. 15, 604 A.2d 1278 (1992), similarly involves two deeds that
included the language “all privileges and appurtenances thereof,” id. at
16-17, 604 A.2d at 1279.  Both precedents involve deeds that passed on the
land involved and, additionally, appurtenances.  They do not govern this
case.  

¶ 22.        
We find that Smith has no spring rights in the property now owned by
WCT.  Therefore, we need not evaluate his claims of error related to the
post-judgment hearing, and the injunction issued by the trial court.

¶ 23.        
Next, we turn to plaintiffs’ claim that the trial court erred by
granting to WCT, on summary judgment, the right to unilaterally relocate two
sets of plaintiffs’ water easements.  The trial court made this ruling in
a written order on October 6, 2010, prior to trial, noting that no facts
related to the question were in dispute.  Our review is de novo.  See
RLI Ins. Co. v. Agency of Transp., 171 Vt. 553, 554, 762 A.2d 475, 477
(2000) (mem.).

¶ 24.        
The following is the background to this question.  Two sets of
neighbors—the Burroughs and the Roys—have water-line easements that cross WCT’s
property underground.  The water line easements provide the families with
water from the water main running along Route 4.  As WCT’s project has
been designed and permitted, the water-line easements will prevent parts of the
development.  WCT sought an order from the trial court permitting
relocation of the easements and the water lines within them to the southern and
eastern edges of its property so that they would not interfere with
construction.  It represented that the relocation would neither
inconvenience the neighbors nor affect the delivery of water to their homes
after a brief interruption in service during the relocation of the pipes. 
It offered to pay all costs of relocation and to provide the neighbors with
bottled water until service is restored.     

¶ 25.        
Both the Burroughs and the Roys objected to the WCT proposal.  They
maintain that they need access to the waterline for repairs and maintenance and
are concerned that the greater length of pipe in the new location will impose a
higher maintenance cost on them.  The Burroughs also expressed concern
that the new waterline location would cross the location of Smith’s spring
right and would interfere with the root system of the trees and other
vegetation along the easterly edge of WCT’s property, exposing them to
litigation.  The trial court granted WCT’s motion for summary judgment,
but noted that “[a] cause of action might, of course, arise in the future if
defendant’s performance falls below the promises it has made in this action and
during the permitting process.”   

¶ 26.        
Plaintiffs argue that the trial court holding is directly contrary to
this Court’s decision in Sweezey v. Neel, 2006 VT 38, 179 Vt. 507, 964
A.2d 1050.  In that case, we reaffirmed the traditional common-law rule
that the owner of a servient estate may not change the location of a
right-of-way without the consent of the easement owner.  Id. ¶¶
21-25; see also Sargent, 121 Vt. at 12, 147 A.2d at 900 (“It is the
general rule that a way, once located, cannot be changed thereafter without the
mutual consent of the owners of the dominant and servient estates.”).  

¶ 27.        
In Sweezey, we expressly rejected the Restatement (Third) of
Property: Servitudes § 4.8(3) (2000) approach to unilateral relocation of
easements.  That section provides:

Unless
expressly denied by the terms of an easement, as defined in § 1.2, the owner of
the servient estate is entitled to make reasonable changes in the location or
dimensions of an easement, at the servient owner’s expense, to permit normal
use or development of the servient estate, but only if the changes do not (a)
significantly lessen the utility of the easement, (b) increase the burdens on
the owner of the easement in its use and enjoyment, or (c) frustrate the
purpose for which the easement was created.

 

Id. 
Plaintiffs maintain that Sweezey is indistinguishable from the present
case, and the Restatement approach is therefore inappropriate.  

¶ 28.        
We disagree.  As the trial court correctly pointed out, Sweezey
involved a surface easement.  The analysis was based on the presumption
that the landowners that set out the easement had considered the factors of
ease of access and the impact of the right-of-way on other uses of the servient
property, and sought to protect that agreement from future unilateral
changes.  Sweezey, 2006 VT 38, ¶¶ 2-6, 24 (describing the
attributes of the easement in detail and explaining the justification for the
traditional rule in the following terms: “ ‘No doubt, when the servitude was first
created both parties considered all market factors, including their respective
costs and benefits, before agreeing on the consideration for the transaction.’
” (quoting Herren v. Pettengill, 538 S.E.2d 735, 736 (Ga. 2000))). 
We noted: “Although there are legitimate arguments in favor of adopting the
Restatement approach, the potential negatives of doing so demand caution before
abandoning our established law foreclosing unilateral relocation of established
easements.”  Id. ¶ 25. 

¶ 29.        
We reiterate that we do not wish to “abandon[] our established law” for
surface easements.  This case, however, presents an opportunity to
evaluate whether a rule adopted for surface easements should be extended to
subsurface easements.  The trial court concluded that if water pipes in an
alternative route delivered proper water pressure and did not increase the
difficulty and expense of maintenance, there was no reason to prevent the
relocation.  It noted that WCT provided expert testimony in support of its
position, but plaintiffs offered only speculative objections.  We concur
in the superior court’s analysis.

¶ 30.        
In reviewing the superior court’s analysis, we note that Sweezey
does not stand for the extreme position that plaintiffs claim.  We
observed that “[c]ontrary to enforcing restrictive covenants, locating
easements often allows some flexibility in terms of creating a remedy that is
satisfactory to all parties,” and that “when the servient estate encroaches
upon the easement, the trial court is not necessarily confined to requiring the
removal of the encroaching structure irrespective of the extent or impact of
the encroachment.”  Sweezey, 2006 VT 38, ¶ 12 (citation
omitted).  In that very case, we found that the superior court had
properly allowed the plaintiff to bend the defendants’ easement to avoid having
to move a permanent structure that encroached a few meters onto the original
easement.  Id. ¶ 13.  We recognize that the flexibility
allowed in Sweezey would not allow the easement relocation here if the
rule for subsurface easements were identical to that for surface easements.[3]  Nevertheless, we are influenced by Sweezey’s
recognition that a result that meets the needs of both the owner of the
dominant estate and the owner of the servient estate is desirable.   

¶ 31.        
Sweezey relied upon two main factors in rejecting the Restatement
approach.  Relying on cases from other jurisdictions, we concluded that
allowing relocation would upset the economic balance involved in the
negotiation of an established easement location.  Id. ¶ 24. 
Second, we concluded that unilateral easement relocation would introduce
uncertainty into land ownership and generate litigation.  Id. 
Both considerations are far less important for subsurface easements, where the
location is relatively unimportant as long as the purpose of the easement is
satisfied.  It is much less likely that the parties bargained over the
path of a water easement with respect to price.  Nor is it likely that
there would have to be litigation to determine the new path of the
easement.  On the other hand, there is a significant likelihood that an
objection to a subsurface easement would be used to stop development and not to
ensure that the purpose of the easement is fulfilled.  In the
underground-easement context, we agree with the Supreme Judicial Court of
Massachusetts that the Restatement approach “strikes an appropriate balance
between the interests of the respective estate owners by permitting the servient
owner to develop his land without unreasonably interfering with the easement
holder’s rights.”  M.P.M. Builders, LLC v. Dwyer, 809 N.E.2d 1053,
1057 (Mass. 2004).[4] 
For these reasons, we adopt the Restatement (Third) of Property: Servitudes §
4.8(3) approach for underground easements.  Of course, an agreement to
relocate, with a determination of the relocation path, is always an effective
and preferred approach.  

¶ 32.        
In adopting a distinction based on the nature of the easement, we note
that other courts have done so before us.  See, e.g., R&S Invs. v.
Auto Auctions, Ltd., 725 N.W.2d 871, 887 (Neb. Ct. App. 2006) (“Given the
nature of the easement in question and the uncertain continued viability of the
old lagoon . . . the district court did not err in applying the Restatement . .
. in resolving this case . . . .”); Texon, Inc. v. Holyoke Mach. Co.,
394 N.E.2d 976, 978 (Mass. App. Ct. 1979) (“Texon must bear the expense of
relocating the steam and electrical conduits so that Holyoke’s benefits from
its easement will be unaltered by the change in Texon’s use of its
land.”).  

¶ 33.        
In making the distinction between above-ground right-of-way easements
and underground easements, we follow somewhat in the footsteps of
Colorado.  In Roaring Fork Club, L.P. v. St. Jude’s Co., 36 P.3d
1229 (Colo. 2001), the Supreme Court of Colorado faced a situation where a
servient estate owner replaced an irrigation ditch—providing water passage over
its land pursuant to an easement—to an underground pipe, but the easement owner
did not suffer any diminution of water provided.  The trial court had
allowed the servient estate owner to make the changes, but required it to
assume responsibility for maintenance.  The Supreme Court noted the
traditional rule that “in the absence of contrary statutes, the location of an
easement when once established cannot be changed by either party without the
other’s consent.”  Id. at 1233 (quotation omitted).  However,
noting the “clear[] . . . distinctions” between ditch easements and other types
of easements, id., the Supreme Court held that “the owner of property
burdened by a ditch easement . . . may not move or alter that easement unless
that owner has the consent of the owner of the easement . . . ; OR unless that
owner first obtains a declaratory determination from a court that the proposed
changes will not significantly lessen the utility of the easement, increase the
burdens on the owner of the easement, or frustrate the purpose for which the
easement was created.”  Id. at 1239.  In partially following
the Colorado approach, we note that a trial court, faced with an action by the
owner of the dominant estate, has the discretion to order the owner of the
servient estate to take over maintenance of the underground easement, as well
as any other appropriate “allocation of costs and burdens of maintenance that
might form part of equitable relief.”  Id.

¶ 34.        
The trial court’s decision on partial summary judgment allowing
unilateral relocation of the two water easements is affirmed.  In doing
so, we also affirm its observation that if WCT’s representations as to the
equivalence of the new path and pipes should not hold true, plaintiffs may
return to the superior court for appropriate relief.  

¶ 35.        
We now turn to David Roy’s and the Hirschbuhls’ adverse possession
claims.  The trial court denied these claims on summary judgment in
October 2009 because it found that the period necessary for adverse possession
had not yet run.  We review a summary judgment order using the same
standard as the trial court.  Vt. Small Bus. Dev. Corp. v Fifth Son
Corp., 2013 VT 7, ¶ 12,  ___Vt. ___, 67 A.3d 241.  

¶ 36.        
To prevail on a claim of adverse possession in Vermont, the adverse possessor
must show that he or she has used or possessed disputed property in an open,
notorious, hostile, and continuous manner throughout the limitations period of
fifteen years.  12 V.S.A. § 501; First Congregation Church of
Enosburg v. Manley, 2008 VT 9, ¶ 13, 183 Vt. 574, 946 A.2d 830.  

¶ 37.        
David Roy contends that he adversely possessed a strip of land eighteen
feet wide along the easterly edge of the driveway into the WHT development
area, and the Hirschbuhls contend that they and their predecessors adversely
possessed a strip of land fourteen feet wide along the edge of the same
driveway, as well as a strip twenty feet wide along the back border of their
property, which is adjacent to the church parking area.  All of the claims
are based on activities such as landscaping, planting bushes, and maintaining a
lawn, which the plaintiffs assert they had been doing for a time period in
excess of fifteen years.  The facts related to the actions of plaintiffs
are not disputed. 

¶ 38.        
No claims for adverse possession may be asserted, however, against
“lands given, granted, sequestered or appropriated to a public, pious or
charitable use, or to lands belonging to the state.”  12
V.S.A. § 462.  As the parcels had been owned from 1981 to 2005
by a church, the trial court found that the time for determining adverse
possession could not include the time in which the property was owned by the
church and, therefore, commenced in 2005.  As a result, it held that
plaintiffs’ adverse possession had not occurred for fifteen years and granted
summary judgment denying that claim.  

¶ 39.        
Plaintiffs appeal this decision for three reasons.  First,
plaintiffs argue that reliance on 12 V.S.A. § 462 was waived because WCT did
not raise it as an affirmative defense in its answer.  Second, they claim
that—assuming that both parcels met the definition of public, pious or
charitable use—WCT cannot now avail itself of that defense as it is a private
owner. Finally, they dispute that parcel 2 was property dedicated to public,
pious or charitable use, and argue that § 462 does not, therefore, apply to
that property. 

¶ 40.        
We begin with plaintiffs’ argument that WCT waived the protection of 12
V.S.A. § 462 by not raising it in its answer.  Plaintiffs made
their adverse possession claims in counts II and III of their complaint. 
In its answer, WCT merely wrote “Denied” as to the assertions.  It did not
mention 12 V.S.A. § 462 at that time, but then relied on it heavily
in its motion for summary judgment, which was granted and forms the basis of
this appeal.

¶ 41.        
Plaintiffs argue, somewhat confusingly, both that WCT did not raise “the
defense of statute of limitations,” and that 12 V.S.A. § 462 “is an
affirmative defense”—apparently, an affirmative defense that is separate from
the statute of limitations.  We address both versions of the argument.

¶ 42.        
First, a note about the terms involved in this analysis.  The terms
“defense” and “statute of limitations” are confusing in this context because of
the particular structure of a claim for adverse possession.  Adverse
possession is a common law cause of action, see Fraley v. Minger, 829
N.E.2d 476, 483-84 (Ind. 2005) (discussing history of “common law doctrine of
adverse possession,” and finding roots as far back as “Code of Hammurabi” in
2250 B.C.), and is not specifically controlled by Vermont statute, except in
the sense that such an action can be brought only after the statute of
limitations for the recovery of land has run.[5]  12 V.S.A. § 501.
 Once the prescriptive period has run, the adverse possessor acquires
title “as perfect as acquisition by grant.”  Montgomery v. Branon,
127 Vt. 89, 89-90, 238 A.2d 650, 655 (1968).  Thus, an adverse possession
claim is really one for recognition of title and enforcement of the rights that
accompany title.  Unless raised by another adverse possessor, the statute
of limitations does not create a defense to an adverse possession claim. 
Plaintiffs have it entirely backwards when they state that WCT’s answer “did
not raise the defense of statute of limitations.”   

¶ 43.        
Plaintiffs’ alternative characterization of 12 V.S.A. § 462 is
as providing an independent affirmative defense of another sort that must be
pled or else waived.  V.R.C.P. 8(c); see Herrera v. Union No. 39
Sch. Dist., 2006 VT 83, ¶ 19, 181 Vt. 198, 917 A.2d 923 (“The statute of
limitations and other avoidance defenses must be pled as affirmative
defenses or else they are waived.” (emphasis added)).  Affirmative or
avoidance defenses are “those that admit the allegations of the complaint but
suggest some other reason why there is no right of recovery, [or] those that
concern allegations outside of the plaintiff’s prima facie case that the
defendant therefore cannot raise by a simple denial in the answer.”  5 C.
Wright et al, Federal Practice and Procedure § 1271 (3d ed. 2012). 
In other words, “[g]enerally speaking, affirmative or avoidance defenses are
unrelated to the plaintiff’s prima facie case.”  Mary Kay, Inc. v.
Dunlap, No. 3:12–CV–0029–D, 2012 WL 6625323, at *5 n.4 (N.D. Tex. Dec. 20,
2012).

¶ 44.        
Here, 12 V.S.A. § 462 could hardly be more related to
plaintiffs’ prima facie case.  In making out their common-law claim for
adverse possession, plaintiffs rely on 12 V.S.A. § 501 for the
statutory fifteen-year period, which they have the burden to prove.  Higgins
v. Ringwig, 128 Vt. 534, 538, 267 A.2d 654, 656 (1970) (the “burden of
proving adverse possession,” including the “statutory period of fifteen years,”
is on the party asserting the adverse possession claim).  Under the
application of the statute used by the superior court, § 462 limits the
applicability of § 501 with respect to lands that are or have been dedicated
to public, pious, or charitable use during the prescriptive period.  Its
effect is to control what periods the adverse possessor can count in order to
show fifteen years of open, notorious, hostile and continuous use or
possession.  To the extent we would consider it a defense, it is not an
affirmative defense, and V.R.C.P. 8(c) imposed no obligation to plead the
application of the statute in WCT’s answer.

¶ 45.        
As neither of the two versions of the argument above are availing, we
agree with the trial court’s determination that WCT did not waive its argument
that § 462 applies and prevents plaintiffs from showing adverse possession for
the necessary prescriptive period.  

¶ 46.        
Next, we turn to the effect of 12 V.S.A. § 462 when the land
is now owned by a private landowner and no longer dedicated to a “public, pious
or charitable use.”  Plaintiffs argue that in such circumstances the
statute has no effect—it prevents an adverse possession claim only when the
land is dedicated to a public, pious or charitable use and not
thereafter.  Thus, they argue that they can reach the fifteen years by
including any time in which the land was owned by the church and dedicated to a
complying use, but a plaintiff engaged in open, notorious and hostile use or
possession such that the church could have sued to prevent the possession or
use.

¶ 47.        
The trial court rejected this argument, interpreting 12
V.S.A. § 462 to mean that “the limitations period for adverse
possession claims never begins to run against property” that fits under the
exception, so “plaintiffs have not established continuous possession of the
property for more than fifteen years.”  WCT argues for this analysis in
this Court.

¶ 48.        
Although our task here is one of statutory construction, we cannot find
that the statute on its face has a plain meaning that resolves the conflict
between the approaches.  Nevertheless, we agree with the trial court and
WCT.  We have recently interpreted 12 V.S.A. § 462 to function
in exactly the way the trial court described.  In Mahoney v. Tara, LLC,
2011 VT 3, 189 Vt. 557, 15 A.3d 122 (mem.), we faced a similar situation where
the plaintiffs brought an adverse possession claim against a private landowner
who had recently acquired land—including the portion that the plaintiffs
alleged that they were adversely possessing—from Vermont Catholic Charities,
Inc. (VCC).  The defendant landowner claimed that VCC used the property
for pious or charitable purposes.  The trial court dismissed the adverse
possession claim based on 12 V.S.A. § 462, and the plaintiffs
appealed, arguing that they should have been given an opportunity to establish
a claim of adverse possession in the time period before VCC purchased
the land in question.  Based on the allegations in the complaint, however,
the plaintiffs’ adverse possession of the land could not have lasted fifteen
years counting only years before or after the time that VCC owned the
property.  We concluded that the “plaintiffs’ claim of ownership by adverse
possession fails without including some portion of the time period that VCC
owned the Tara Lot,” and declined to count those years.  Id. ¶
8.  Mahoney necessarily holds that for purposes of an adverse
possession claim, the period during which the land falls under the public,
pious or charitable use exception of 12 V.S.A. § 462 cannot be
counted toward the statutory fifteen-year prescriptive period of 12
V.S.A. § 501, even when the land is no longer in public, pious or
charitable use.

¶ 49.        
We recognize that Mahoney contains little analysis of the
competing positions on the meaning of the statute.  Thus, we have looked
to the analysis of the issue in other jurisdictions.  In doing so, we note
that § 462 treats identically public, pious or charitable uses and “lands
belonging to the state.”  Other states have a similar exception for lands
owned by government for public uses, although generally not including an
exception for pious or charitable uses, and have faced the same question. 
Based on this review, we note that Mahoney reflects the majority, if not
unanimous, rule from comparable decisions in other jurisdictions.  See,
e.g., Loavenbruck v. Rohrbach, 2002 ME 73, ¶ 14 n.5, 795 A.2d 90
(collecting cases); see generally 16 R. Powell, Powell on Real Property §
91.11[2], at 91-86 (2000) (“Courts have also held that where land was
previously owned by the government and is currently held by a private
individual and a claimant adversely occupied the land during the entire time,
the period of adverse possession against the government is not counted in
determining the validity of the claim.”).  We also note that courts in the
one state that has a statute identical to 12 V.S.A. § 462, see Mo. Stat. Ann. §
516.090, have interpreted it to apply as the trial court did here.  See Rice
v. Huff, 22 S.W.3d 774, 781 (Mo. Ct. App. 2000) (applying § 516.090 and
holding that “the statute of limitations on an adverse possession claim of a
dedicated street only begins to run once a city vacates or discontinues the street”);
see also Przybylski v. Barbosa, 289 S.W.3d 641, 644 (Mo. Ct. App. 2009)
(same).

¶ 50.        
This conclusion also makes sense given the policy concerns behind §
462.  As the Supreme Court of Missouri observed in construing the
identical statutory language:  “Prior to [the] statute[,] this state had,
through its statutes, adopted the policy of allowing limitations to run against
the state and municipalities.  It was found to be a ruinous public policy,
for under it [public lands] were lost . . . through the laches or ignorance of
the public or of officials representing it.”  Dudley v. Clark, 164
S.W. 608, 612 (Mo. 1914); see also Empire Dist. Elec. Co. v. Gaar, 26
S.W.3d 370, 376 (Mo. Ct. App. 2000).  This policy reason was also
expressed in the leading case of Gibson v. Chouteau, 80 U.S. 92, 99
(1871), with respect to public land, which noted that “no laches can be imputed
to the king, and . . . he ought not suffer from the negligence of his officers
and servants.”  The statute also favors uses of land protected by
it.  See Soc’y for the Propagation of the Gospel v. Town of Pawlet,
29 U.S. 480, 505 (1830) (“The public have a deep and permanent interest in such
charities [protected by the predecessor of 12 V.S.A. § 462], and that interest
far outweighs all considerations of mere private convenience.”); Dudley,
164 S.W. at 612 (stating that “the law favors pious and charitable uses as well
as public ones”).

¶ 51.        
Under plaintiffs’ theory, although the land can remain in public,
charitable or pious use indefinitely, its value can be partially or totally
eroded as a result of adverse possession of some or all of it during the time
the use qualifies under § 462.  If the land moves from public, pious or
charitable use, or state ownership, to a use or ownership not protected by §
462, its value will immediately be impaired or eliminated.  In this case,
for example, the land owned by the church will be greatly reduced in value if
the access from Route 4 is so restricted on transfer that development becomes
impossible.  We do not believe that such a result is consistent with the
protective policy of § 462.  Indeed, the owner of the land covered by §
462 would have almost the same need to prevent encroachment as if § 462 did not
exist.  

¶ 52.        
Because the trial court’s reading of § 462 is in line with our
precedent, with precedents from other jurisdictions, and with the policy
concerns behind the provision, we affirm its conclusion that plaintiffs may not
rely on the years during which the church owned the property in question and
dedicated it to a public, pious or charitable use to make their adverse
possession claims. 

¶ 53.        
Finally, we address plaintiffs’ claim that the trial court erred in
finding that parcel 2 had been dedicated to “pious and public purposes.”[6]  The material facts are as
follows.  Between 1981 and 2005, both parcels were owned by a religious
organization known as the Woodstock Baptist Fellowship, later known as The Rock
Church.  According to affidavits submitted with WCT’s motion for summary
judgment, the church used the properties for numerous religious activities,
including weekly church services and Sunday school programs, as well as bible
studies during the week and a youth bible camp during the summer.  It
occasionally held picnics on the property, and during bible school in the
summer, children played games and engaged in activities on the playing field
and other portions of the property.  The property was also used by the
public: the church allowed the public to use the parking lot for Fourth-of-July
fireworks, a Boy Scout troop held meetings on the property, and the local
middle and high schools used and maintained the fields for sports practices and
games.  The Woodstock Recreation Center also used the playing field for
sports practices and programs.  

¶ 54.        
Plaintiffs did not dispute any of these facts about the use of the
property at trial.  Instead, they argued that the property does not
qualify under § 462 because its “primary use was [as] a church with a defined,
specific membership,” and therefore the church did not “use the property for
the benefit of an indefinite class of people.”[7]  In making this argument, plaintiffs
relied on our analysis of § 462 in MacDonough-Webster Lodge No. 26 v. Wells,
2003 VT 70, 175 Vt. 382, 834 A.2d 25.  There we held that the analytic
framework for applying the charitable-use exemption from property taxation
contained in 32 V.S.A. § 3802(4) also applied to the charitable-use
exemption of § 462.  This entailed application of the three-part test for
“public” use announced in American Museum of Fly Fishing, Inc. v. Town of
Manchester, 151 Vt. 103, 110, 557 A.2d 900, 904 (1989), and later extended
to “charitable” use in, among other decisions, Institute of Professional
Practice v. Town of Berlin, 174 Vt. 535, 536, 811 A.2d 1238, 1240 (2002)
(mem.) (holding that, “[t]o be exempt from property tax as a public or
charitable use,” the property must meet the American Museum test).

¶ 55.        
The elements of the American Museum test are: “(1) the property
must be dedicated unconditionally to public use; (2) the primary use must
directly benefit an indefinite class of persons who are part of the public, and
must also confer a benefit on society as a result of the benefit conferred on
the persons directly served; and (3) the property must be owned and operated on
a not-for-profit basis.”  151 Vt. at 110, 557 A.2d at 904; see also MacDonough,
2003 VT 70, ¶ 13.  We expanded upon the second prong of the analysis in Sigler
Foundation v. Town of Norwich, examining the criteria to determine whether
a given use of land conferred “a private, as opposed to [a] general, or
indefinite benefit.” 174 Vt. 129, 134, 807 A.2d 442, 446 (2002).  We
explained that “[p]ublic uses are characterized as such, in part because of the
breadth and scope of the users” while “[p]rivate uses . . . are characterized
by the benefits bestowed on a particular” group, and further observed that it
is “the character and quality of an organization’s ‘choice,’ ‘selection,’ or
‘judgment’ criteria used to determine its beneficiaries that informs the
question of whether or not the organization’s use of its property benefits an
indefinite class that is part of the public and, thus, confers a benefit on
society.”  Id. at 134, 807 A.2d at 447.  

¶ 56.        
Plaintiffs argue that the circumstances here meet none of the prongs of
the American Museum test.  We can summarily dispose of plaintiffs’
arguments that WCT does not meet the first and third prong of the test because
they focus on WCT’s use of the land.  WCT has not claimed, and the
superior court did not find, that WCT’s use met the test.  As stated
earlier, the application of § 462 here turns on the use of the parcel by WCT’s
predecessor, the Woodstock Baptist Fellowship or Rock Church, not by WCT. 


¶ 57.        
Plaintiffs’ argument that the second prong of the test is not met
because the church did not benefit an “indefinite class of people” requires us
to determine whether, and how, the three-part test should apply in these
circumstances.  We do not write on a blank slate in this regard.  In
at least two prior decisions we indicated that the three-part American
Museum test applied to pious uses.  In Lincoln Street, Inc. v. Town
of Springfield, we stated that “[t]he purpose of § 3802(4) . . . is to
benefit the community as a whole by benefiting that indefinite part of the
public served by public, pious, or charitable organizations.”  159 Vt.
181, 185, 615 A.2d 1028, 1031 (1992).  Later, in Herrick v. Marlboro,
we concluded that we were bound “to extend the ‘public use’ test to lands
sequestered for pious and charitable uses under the statute.”  173 Vt.
170, 174, 789 A.2d 915, 918 (2001); see also In re Abbey Church, 145 Vt.
227, 230, 485 A.2d 1263, 1265 (1984) (observing that “[t]he purpose of the
exemption statute is to benefit an indefinite class of persons who are part of
the public”).  

¶ 58.        
Significantly, however, none of these cases actually presented the
question of whether the property at issue met the requirement that it benefit
an “indefinite class” in order to qualify for the pious-use exemption.  Lincoln
had nothing to do with pious uses.  The question there was whether a
non-profit organization “that serves mentally retarded persons” in a leased
residential home could claim the exemption, or whether it was available only to
the owners of the property.  Lincoln, 159 Vt. at 182, 615 A.2d at
1029.  Construing the third American Museum criterion that the
“property must be owned and operated on a not-for-profit basis,” 151 Vt. at
110, 557 A.2d at 904, we concluded that “the concurrence of nonprofit ownership
and use is necessary to make the statute as a whole effective” in serving the
legislative intent.  Lincoln, 159 Vt. at 185, 615 A.2d at
1030.  That intent required that “the public or charitable use must confer
a benefit on the public generally,” id. at 185, 615 A.2d at 1031, which
in turn required that the exemption flow to the beneficial users, not the
private owners.  Id. at 186, 615 A.2d at 1031.  Nothing in the
opinion, despite the language cited earlier, implicated the question of whether
a property must benefit an “indefinite class” under the second criterion to
qualify as a pious use under the statute.    

¶ 59.        
The same holds true for Herrick.  There, the question was
whether the owner of property which he had set aside or “sequestered” for use
by a nonprofit corporation known as the Mountain Ministry, Inc. could claim the
pious use exemption, or whether, as we held in Lincoln, the statute
required the “concurrence of nonprofit ownership and use.”  173 Vt. at
175, 789 A.2d at 919.  Again we held that the benefit of the exemption
must flow to the users, not just the owners.  Id.  Abbey
Church, 145 Vt. 227, 485 A.2d 1263, involved a similar question, equally
unrelated to the issue before us.  The town there did not “contest the
issue of pious use,” id. at 228, 485 A.2d at 1264; the question was
whether a property owner who had leased his land to a church was entitled to
the statutory exemption, and we held again that the exemption must flow to the
church or “pious” user, not the private owner.  Id. at 230, 485
A.2d at 1265.  

¶ 60.        
We have long recognized that the overarching goal of the exemptions set
forth in §§ 3802(4) and 462—including the exemption for “pious” use—is to
provide a broad public benefit.  As we explained in Chittenden v.
Waterbury Center Community Church, § 462 “includes property dedicated to
‘pious’ use among a broad class of property the use of which is generally
considered sufficiently benevolent to warrant a perpetual exemption from
adverse possession claims or prescriptive easements.”  168 Vt. 478, 484,
726 A.2d 20, 25 (1998).  Indeed, in an early decision construing the
statute, the U.S. Supreme Court itself recognized that “good grounds” and sound
public policy underlie the exemption in § 462, and that the public retains a
“deep and permanent interest” in exempting public, pious, and charitable uses
from adverse possession claims.  Soc’y for the Propagation of the
Gospel, 29 U.S. at 505 (cited in Waterbury Ctr., 168 Vt. at 484, 726
A.2d at 25); see also Am. Museum, 151 Vt. at 106-107, 557 A.2d at 902
(describing the general purpose of § 3802(4) as the “ ‘support of schools
and churches believed necessary for the encouragement of settlement in colonial
. . . Vermont” (quoting Brattleboro Child Dev., Inc. v. Town of
Brattleboro, 138 Vt. 402, 405, 416 A.2d 152, 154 (1980)).  That
policy, as we observed in Waterbury Center, is fundamentally rooted in
Chapter II, § 68 of the Vermont Constitution,[8] which “protects pious activities as part
of a broader class of benevolent objectives.”  168 Vt. at 485, 726 A.2d at
25.       

¶ 61.        
The broad public benefit that underlies all of the statutory exemptions,
however, is different from the distinctly public character that we require of
property in order to specifically qualify as a “public” use.  As we
explained in American Museum, the public-use exemption exists “for the
performance of service essentially public in nature . . . and, in so
doing, assumes a share of the public burden.”  151 Vt. at 109, 557 A.2d at
904 (quoting English Language Ctr., Inc. v. Town of Wallingford, 132 Vt.
327, 329-30, 318 A.2d 180, 182 (1974)) (emphasis added).  We have
suggested that a similar public character must inhere in certain “charitable”
uses in order to qualify for the statutory exemption.  See MacDonough-Webster,
2003 VT 70, ¶ 16 (holding that a fraternal lodge which did not “benefit an
indefinite segment of the public at large” could not qualify for the
charitable-use exemption of § 462).[9]
  

¶ 62.        
To expect, however, that a church or other property dedicated to “pious”
use must perform a similar “service essentially public in nature,” much less
that it must “directly benefit an indefinite class of persons” to qualify for
the statutory exemption, goes beyond the purpose of the statute in this
context.  Churches may well promote “benevolent objectives” salutary to
their adherents and society in general but they do not necessarily provide a
“service public in nature” nor do they necessarily or invariably serve an
“indefinite class” of the public.  On the contrary, religious worship is
fundamentally a matter of private conscience and practice, and churches vary
widely in matters of openness, membership criteria, hierarchy, and
selection.  To apply the American Museum “public use” requirements
in a rigorous and honest manner in this context, therefore, would exclude many
religious organizations that would otherwise clearly qualify as “pious” in any
traditional sense, effectively rendering the exemption a nullity.  It is,
of course, axiomatic that statutes must not be construed in a manner that would
render their language superfluous or lead to irrational results.  In re
Lunde, 166 Vt. 167, 171, 688 A.2d 1312, 1315 (1997) (“Generally, we do not
construe a statute in a way that renders a significant part of it pure
surplusage.” (quotation omitted)).[10] 


¶ 63.        
Notwithstanding the broad language in our earlier decisions, therefore,
it is self-evident that the qualifying criteria set forth in American Museum
and its progeny for public or charitable uses have no application to the
pious-use exemption.[11]
 The question must turn generally, therefore, on whether a property meets
the standard for “pious” use, subject to the more limiting requirements of 32
V.S.A. § 3832(2).  See Mahoney 2011 VT 3, ¶¶  10-11 (observing
that the focus of § 462 is not on lands “held” by a public, pious or charitable
organization but rather on lands given to “a public, pious, or charitable use,”
and holding that while an organization’s name may “suggest[] it is a pious or
charitable organization, the name alone does not reveal whether the use
of the property was for a privileged purpose”); Waterbury Ctr., 168 Vt.
at 487, 726 A.2d at 26-27 (rejecting the notion that making courts the
“ultimate arbiters” of what qualifies as “pious” under § 462 results in
excessive government “entanglement” with religion).  The latter provision,
as we have noted, “limits the scope” of the pious-use exemption, Our Lady of
Ephesus House of Prayer, Inc. v. Town of Jamaica, 2005 VT 16, ¶ 15, 178 Vt.
35, 869 A.2d 145,  by excluding 

 
[r]eal estate owned or kept by a religious society other than a church edifice,
a parsonage, the outbuildings of the church edifice or parsonage, a building
used as a convent, school, orphanage, home or hospital, land adjacent to any of
the buildings named in this subsection, kept and used as a parking lot not used
to produce income, lawn, playground or garden and the so-called glebe lands.

 

32 V.S.A. § 3832(2). 
          

¶ 64.        
Our task in this regard is made easier by the fact that plaintiffs have
not challenged the court’s finding that, between 1981 and 2005, the property in
question “was owned by a non-profit church and dedicated to religious and
community uses.”  Given the facts of this case, therefore, we easily
conclude that WCT’s predecessor satisfied the requirement for pious use under
the statute.  We also have little difficulty concluding that the first and
third requirements of the American Museum test, in slightly modified
form, remain applicable, and are easily satisfied here.  As we explained
in American Museum, the crucial factor under §  3802(4) is the
“primary use to which property is put,” 151 Vt. at 108, 557 A.2d at 903, and
hence that it should be “dedicated unconditionally” to the use for which the
exemption is claimed, whether it be public, pious, or charitable in
nature.  Id. at 110, 557 A.2d at 904.  The requirement that
the “property must be owned and operated on a not-for-profit basis” also
applies with equal force to public, pious and charitable uses.  Id. 
Here, there was no dispute that the property, when owned by the church, was
dedicated to pious use and operated on a nonprofit basis, and plaintiffs have
not challenged the court’s specific finding in this regard.  We therefore
affirm the trial court’s conclusion that § 462 applied to parcel 2 to negate
plaintiffs’ claim for adverse possession.

¶ 65.        
We now address plaintiffs’ argument that plaintiffs hold title to part
of parcel 2 by acquiescence.  During trial, plaintiffs attempted to prove
that David Roy and the Hirschbuhls and WCT’s predecessor had acquiesced to a
common boundary.  See Okemo Mountain, Inc. v. Lysobey, 2005 VT 55,
¶ 14, 178 Vt. 608, 883 A.2d 757 (mem.) (stating requirements for establishing
boundary by acquiescence).  After plaintiffs’ case was presented, WCT
moved for judgment as a matter of law under V.R.C.P. 50(a)(1) on plaintiffs’
claim that a boundary had been established by acquiescence, and the trial court
granted it, finding that the boundary-by-acquiescence claim, just like the
adverse possession claim that had been rejected at summary judgment, was barred
by 12 V.S.A. § 462.  As explained earlier, we review judgments
as a matter of law de novo.  Gero, 171 Vt. at 59, 757 A.2d at
476.  The question of whether the use of the property between 1981 and
2005 was for public or pious use was determined at the summary judgment phase,
and we affirm that finding, as explained in the section above.  Therefore,
we must address only the legal question of whether 12 V.S.A. § 462
applies to boundary-by-acquiescence claims.[12]

¶ 66.        
Plaintiffs argue that it does not—that boundary by acquiescence borrows
the fifteen year time-period of adverse possession but is not rooted in the
timing of filing suit to recover property, and thus the policies behind 12
V.S.A. § 462 do not apply.  The trial court, on the other
hand, “conclude[d] that the claims . . . being made by the
Roys and the Hirschbuhls to modify the boundaries of the property immediately
adjacent to the driveway by boundary by acquiescence are, essentially, much too
similar to an adverse possession claim not to be barred by § 462.”  The
trial court concluded that the policies behind § 462 were just as applicable to
claims of boundary by acquiescence as to adverse possession.    

¶ 67.        
We find ourselves in accord with the trial court.  “A boundary is
established by acquiescence when there is ‘mutual recognition of a given line
by the adjoining owners, and such actual continuous possession by one or both
to the line’ for the statutory period required to establish ownership by
adverse possession.”  Lakeview Farm, Inc. v. Enman, 166 Vt. 158,
162, 689 A.2d 1089, 1091-92 (1997) (quoting D’Orazio v. Pashby, 102 Vt.
480, 487, 150 A. 70, 73 (1930)).  An element of a claim of boundary by
acquiescence is possession for the full statutory period, as defined by 12
V.S.A. § 501, and § 462 limits the applicability of § 501 to
lands dedicated to public, pious, or charitable use.  The plain meaning of
the words in the statute makes it clear that § 462 applies to all actions for
which proving the statutory period defined in § 501 is an element.

¶ 68.        
Moreover, we have recognized that the principle underlying the doctrine
of boundary by acquiescence is one and the same as that on which adverse
possession is based:

Here,
[the landowner] recognized the boundaries by default.  [The landowner]’s
complete absence from the contested area implies acquiescence to whatever
boundary line the [party asserting boundary by acquiescence] observed.
 This is the principle underlying the doctrine of adverse possession: That
a landowner so inattentive as to permit occupation of its land for fifteen
years must accept the subsequent loss of title.

 

N.A.S.
Holdings, Inc. v. Pafundi, 169 Vt. 437, 446, 736 A.2d 780, 788
(1999).  Consequently, the policy behind the § 462 exception—that
land should not be “lost to the state and public through the laches or
ignorance of the public or of officials representing it,” MacDonough,
2003 VT 70, ¶ 10 (quotation omitted)—applies with equal force to claims of
boundary by acquiescence.  We affirm the trial court’s decision as a matter
of law that plaintiffs’ boundary-by-acquiescence claim is barred by 12
V.S.A. § 462.

¶ 69.        
Next, count IV of plaintiffs’ complaint sought a declaratory judgment
that the right of way that WCT held through David Roy’s land was limited to the
use associated with a single-family residence on WCT’s parcel, and also sought
an injunction to prohibit use of the right of way during the construction
process.  At the close of evidence, the trial court orally granted WCT’s
Rule 50 motion for judgment as a matter of law that the easement was not so
limited and plaintiffs had no right to stop use of the right of way during
construction.  Plaintiffs argue on appeal that the judge should not have
decided the question of the scope of the easement as a matter of law but should
instead have submitted it to the jury.  Again, we review the court’s
decision de novo, using the same standard as the trial court.  Gero,
171 Vt. at 59, 757 A.2d at 476.

¶ 70.        
Vermont law is clear that “a [dominant] . . . estate must use a
right-of-way in a manner consistent with the use contemplated at the time of
its creation, and it may not use it in a way that materially increases the
burden on the servient estate.”  Rowe v. Lavanway, 2006 VT 47, ¶
22, 180 Vt. 505, 904 A.2d 78 (mem.).  However, “[t]he manner, frequency,
and intensity of the use may change over time to take advantage of developments
in technology and to accommodate normal development of the dominant estate or
enterprise benefited by the servitude.”  Id. ¶ 23 (quoting
Restatement (Third) of Property, Servitudes § 4.10 (2000)).

¶ 71.        
Testimony by David Roy at trial revealed that the twenty-eight-foot
easement in question was originally granted to John Donnelly, who then owned
all of the property in question—both the two parcels that WCT now owns and the
property now owned by David Roy.  When he sold the property to David Roy,
he reserved that easement for “ingress and egress” to what is now WCT’s
property, which was an open lot at the time.  David Roy described his
understanding of the reason for the unusually large right of way: “I believe
the Baptists were interested in buying the property out back and they wanted a
wider right-of-way than the twenty-two feet that was existing.”   

¶ 72.        
Plaintiffs acknowledge that the easement obtained by Donnelly was for
“ingress and egress,” and do not suggest that WCT wishes to use the easement
for any other purpose.[13] 
They argue only that the increased use due to WCT’s project “exceed[s] the
scope of the deed anticipated by the parties at the time the easement was
created.”  They assert, with no reference to the record, that “limited and
infrequent travel was anticipated at the time of the execution [of the deed]
and historically experienced,” and that the proposed project will mean
significantly more traffic on the right of way than in the past—either at the
time of the execution of the deed including the easement or during the time
that the property was being used as a church.

¶ 73.        
While we can conceive of situations in which increased use of an
easement, even when the type of use is the same as its original use, could be
so far above what was originally contemplated that it could be “[in]consistent
with the use contemplated at the time of its creation” or could “materially
increase[] the burden on the servient estate,” Rowe, 2006 VT 47,
¶ 22, this is not such a case.

¶ 74.        
“The character of an easement depends on the intent of the parties, as
drawn from the language of the deed, the circumstances existing at the time of
execution, and the object and purpose to be accomplished by the easement.”
 Barrett v. Kunz, 158 Vt. 15, 18, 604 A.2d 1278,
 (1992).  As noted by the trial court, the right of way is
twenty-eight feet wide—much wider than a typical driveway—and Roy himself
testified that he understood that it was being created with those dimensions
and that the church used it for the public to enter and exit.   Furthermore,
the language of the easement contained no restrictions whatsoever on the volume
of use; we are reluctant to read one into it.  The testimony is not
consistent with plaintiffs’ description on appeal of use limited to that
associated with a single-family residence.  Furthermore, plaintiffs
presented no evidence that WCT’s project did not constitute “normal development
of the dominant estate,” which we found in Rowe should be
accommodated.  2006 VT 47, ¶ 23.  

¶ 75.        
We agree with the trial court that WCT’s proposed use of the right of
way does not constitute a violation of the easement, and therefore that
plaintiffs’ request for an order restricting use to that associated with a
single-family residence must be denied.

¶ 76.        
Plaintiffs’ last argument is that the trial court erred when, in its
summary judgment order of October 6, 2010, it dismissed without prejudice
plaintiffs’ nuisance claim for lack of ripeness.  At the time of that
order, the result of plaintiffs’ appeal of the town permit and the Act 250
permit to the environmental court was not yet known, and the court found that,
“[g]iven the ongoing nature of the permitting proceedings,” it was
“not . . . in a position to make any determination as to
whether the existing plan constitutes a nuisance.”  It continued: “If and
when the proposed development is finally approved to be built, plaintiffs may
assert a cause of action for nuisance based on the noise, light, garbage, and
traffic that would be generated by the proposed housing development as it is
required to operate under the terms of its final land use permits.” 

¶ 77.        
As we explained in Wild v. Brooks, a dismissal of a nuisance
claim is proper when the facts related to such a claim are not in existence:

[A]
court may properly enjoin a legally operated business if it finds that its
operation creates a substantial and unreasonable interference with another’s
lawful use and enjoyment of her property, i.e., a nuisance.  But as we
have explained, this is a multi-factored analysis that should not be conducted
when the facts bearing on the analysis are not known.

 

2004 VT 74, ¶ 17, 177 Vt. 171, 862
A.2d 225.  The fact that we have since approved the permits does not
change this analysis: “The fact that [some of the facts relied on by the trial
court in deciding to dismiss an action for nuisance changed] after the court
had entered final judgment does not invalidate a decision that was correct when
it was entered.”  Id. ¶ 9.

¶ 78.        
While they accept the basic rule of Wild, plaintiffs contend that
“prospective relief for nuisance is available and should be encouraged with
proposed projects to minimize waste and delay,” and that “less drastic
measures” than dismissal of the claim can “address any concerns about the
ultimate shape of the project.”  It is not clear to us what “less drastic
measures” plaintiffs were suggesting and dismissing the nuisance claim without
prejudice while emphasizing that it can be brought later hardly seems to merit
the label of “drastic.”

¶ 79.        
Therefore, we agree with the trial court that at the time the summary
judgment order was entered, it was impossible to make any ruling on the
nuisance claim as the permits had not yet been approved and the impact of the
project on the neighbors could not be fully predicted.  Dismissal of the
claim without prejudice was therefore proper.  

¶ 80.        
Recognizing that we have now affirmed the permits for this project, we
can give a more complete answer on this issue.  A court can issue a
prospective injunction against a “nuisance per se.”  See Murphy Motor
Sales, Inc. v. First Nat’l Bank of St. Johnsbury, 122 Vt. 121, 122, 165
A.2d 341, 342 (1960) (dismissing claim for prospective injunction against diner
in part because plaintiff “makes no claim that the operation of the diner will
be a nuisance per se”); In re St. George, 125 Vt. 408, 412, 217 A.2d 45,
47 (1966) (“While a depository for receiving garbage and refuse, such as a
landfill operation, may not be a nuisance in itself, it may develop into an
unlawful use in violation of the rights of the adjoining landowners.”); see
also Wernke v. Halas, 600 N.E.2d 117, 120 (Ind. Ct. App. 1992) (nuisance
per se is “that which is a nuisance itself, and which, therefore cannot be so
conducted or maintained as to be lawfully carried on or permitted to exist”
(quotation omitted)); Sowers v. Forest Hills Subdivision, 294 P.3d 427,
431 (Nev. 2013) (nuisance per se is a “nuisance at all times and under any
circumstances, regardless of location or surroundings”).  In this case,
where the residential development has gone through an extensive permitting
process both in the town development review board and in the district
environmental commission, and both permits have been upheld by the
environmental division of the superior court and by this Court, we cannot find
the development to constitute a nuisance per se.  We recognize, however,
that even a lawfully permitted project may be a nuisance based on its
“conditions or manner of operation.”  Trickett v. Ochs, 2003 VT 91,
¶ 35, 176 Vt. 89, 838 A.2d 66.  Thus, dismissal without prejudice
fully protected plaintiffs’ right to renew the nuisance claim once the impact
of the project is known.  

¶ 81.        
We affirm the trial court’s dismissal without prejudice of plaintiffs’
nuisance claim.

Affirmed in part, reversed
in part, and remanded for further proceedings not inconsistent with this
decision.

 


  
 
 
  
 
 
 FOR THE COURT:
 
 
  
 
 
  
 
 
  
  
  
  
 
 
  
 
 
  
 
 
 Associate
 Justice
 
  











[1] 
As there are multiple parties who have the surname of Roy, we will use “David
Roy” to refer to David Roy and “the Roys” to Richard and Roberta Roy. 
None of the claims of error relate specifically to Mary Roy.





[2]
 Roy also testified to a “wetland,” but no spring or structure. 
There was also a survey map introduced by counsel for WCT that had a reference
to a blind spring.   





[3] 
One of the factors the Sweezey Court relied upon was acquiescence by the
owners of the dominant estate to bending the easement.  Id. ¶
18.  There is no such acquiescence here.  

 





[4] 
We have taken this statement from the Massachusetts court, recognizing that it
found this logic to hold true for all easements, not just underground
easements.





[5]  Some states have created specific
adverse possession statutes.  See, e.g., Uhl v. Krupsky, 294 P.3d
559, 561-62 (Or. Ct. App. 2012) (“In 1989, the legislature enacted ORS 105.620,
codifying the common law . . . .”); Tex. Civ. Prac. & Rem.
Code §§ 16.021 et seq.  Others have not, but have used their statutes of
limitations on real property, in combination with a common law cause of action,
to allow adverse possession claims.  See Gormin v. City of Woodinville,
283 P.3d 1082, 1085-86 (Wash. 2012) (Madsen, C.J., concurring) (explaining that
in Washington, “the doctrine of adverse possession is primarily covered by
three statutes of limitation,” and concluding that “as it has developed in our
state, the doctrine is not entirely a creature of the common law, although that
is where its origins lie”).  Vermont is a member of the second group of
states.

 





[6] 
Plaintiffs have not argued that § 462 does not apply to parcel 1.

 





[7] 
In fact, the affidavits in support of summary judgment filed by WCT did not
address whether the church had members or otherwise admitted the public.  





[8] 
This section, in pertinent part, provides:

 

All religious
societies, or bodies of people that may be united or incorporated for the
advancement of religion and learning, or for other pious and charitable
purposes, shall be encouraged and protected in the enjoyment of the privileges,
immunities, and estates, which they in justice ought to enjoy, under such
regulations as the general assembly of this state shall direct.

 

Vt. Const., ch. II, §
68.  By noting the statute’s consistency with this constitutional
provision, we are not deciding in this case whether the statutory exemptions
are constitutionally required.  We express no opinion on that question,
which is not before us.

 





[9] 
It could be argued that the public-use requirement has equally little
application to certain non-profit organizations dedicated to charitable uses
that benefit discrete segments of the public, but that issue is not before us,
and we therefore express no view on the matter. 

 





[10]
 The trial court here, as noted earlier, found no evidence to suggest
“that the doors of the church were not open to anyone who wished to attend,”
and thus in essence applied to the church a presumption that it benefited an
“indefinite class.”  Although we observed in Lincoln Street that
the “purpose of § 3802(4) . . . is to benefit the community as a whole by
benefitting that indefinite part of the public served by public, pious, or
charitable organizations,” 159 Vt. at 185, 615 A.2d at 1031, it appears more
likely that we were describing the general public benefit of exempting churches
from the payment of property taxes rather than purporting to establish a broad
presumption that religious organizations inherently meet the American Museum
test. The question of whether the church served an “indefinite class” of the
public is immaterial, however, in view of our conclusion that this requirement
has no application in the pious-use context.   

 





[11] 
Because, as noted, our earlier decisions did not address the question presented
here,  their broad language was essentially non-binding dicta, and as such
need not be specifically overruled.  See Pepin v. Allstate Ins. Co.,
2004 VT 18, ¶ 16, 176 Vt. 307, 848 A.2d 269 (noting that “dicta . . . is not
binding authority”); Chittenden Town Sch. Dist. v. Dep’t of Educ., 169
Vt. 310, 348, 738 A.2d 539, 566 (1999) (“Dicta, it need hardly be stated, have
no binding precedential effect.”).





[12] 
We faced this precise question in Mahoney but did not decide it because
we remanded for other reasons.  2011 VT 3, ¶ 13.





[13] 
Roy testified that, initially, WCT proposed putting parking on the right of
way.  He said: “They can use it to drive in and drive out and I told them
any other use that I would fight them on it.”